**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------- X

In re:                                                                    :          Chapter 11

                                                                         :

461 7TH AVENUE MARKET, INC.,                       :          Case No. 18-22671 (RDD)

                                                                         :

                                       Debtor.                 :

-------------------------------------------------------------------- X

<u>**AFFIDAVIT**</u>

STATE OF NEW YORK              )

                                               )    ss.:

COUNTY OF NEW YORK          )

MICHAEL SHAH, being duly sworn, deposes and says:

1.      I am a member of Delshah 461 Seventh Avenue, LLC ("Delshah" or "Landlord"), the owner and landlord of the premises known as and located at 461 7th Ave., New York, NY, 10001 (the "Premises").

2.      The original lease for the Premises was executed on or about July, 2003, between Mary Jane Medicus O'Brien and John Delmour Medicus, as landlord, and 461, Inc., as tenant (the "Lease"). A copy of said Lease is annexed hereto as Exhibit A.

3.      Pursuant to an assignment and assumption of lease dated December 5, 2004, 461, Inc. assigned the Lease to Median Farm, Inc. (the "First Assignment"). A copy of the First Assignment is annexed hereto as Exhibit B.

4.      Said lease was further assigned by subsequent assignment and assumption of lease, dated January 5, 2011, by Median Farm, Inc. to 461 7th Avenue Market, Inc. (the "Second Assignment"). A copy of the Second Assignment is annexed hereto as Exhibit C.

5.　　　　461 7th Ave. Market, Inc. ("Tenant" or "Debtor") was served with a Notice to Cure dated January 19, 2017 ("NOC"), a copy of which is annexed into as Exhibit D.

6.　　　　The eight page NOC set forth a number of alleged breaches of lease, and required same to be cured on or before the 28th day of February, 2017.  See Exhibit D.

7.　　　　The NOC informed the Tenant that upon its failure to so cure, the landlord would elect to terminate the Lease in accordance with Article 2.01 of the Lease and applicable provisions of law.  See Exhibit D.

8.　　　　In response to the NOC, Jay Cho ("Cho"), Tenant's licensed architect, sent a letter to Delshah's attorneys dated February 3, 2017 (the "Architect's Letter"), a copy of which is annexed thereto as Exhibit E.

9.　　　　The Architect's Letter acknowledged Tenant's breach of many of the allegations set forth in the Landlord's NOC, and stated, in conclusion:

> "Our office is beginning to investigate these open applications and look for the requirements to confirm the possibility of either job withdrawal or sign off. And preparing the C of O amendment (referring to the certificate of occupancy). [*sic*]. *See* Exhibit E.

10.　　　　Tenant thereafter sought to stay Delshah from terminating the Lease by requesting an order to show cause and commencing an action in Supreme Court of the State of New York, New York County, in an effort to obtain what is commonly referred to as a "*Yellowstone* Injunction."  Said action was commenced in the Commercial Division, and assigned to the Hon. O. Peter Sherwood, under index number 650843/2017, which can be found on the NYC Unified Court website at

https://iapps.courts.state.ny.us/nyscef/DocumentList?docketId=_PLUS_Yqx8A_PLUS_xCDv1q paCTCsdTw==&display=all

11.     In support of the order to cause for a *Yellowstone* injunction, an affidavit was submitted by Young Il Park ("Park"), wherein Park stated that he is "the owner of 461 7th Ave. Market Inc … leaseholder of the premises commonly known as 461 7th Ave., New York, NY 10001" (the "Park Affidavit"). Annexed hereto as Exhibit F is a copy of said affidavit.

12.     In paragraph 19 of the Park Affidavit, Park stated that "it is impossible to complete the work and obtain the necessary permits and/or certificates of occupancy within the alleged cure period that expires on February 28, 2017." See Exhibit F.

13.     Park also represented to Justice Sherwood that "the plaintiff is working with Cho to diligently and expeditiously get all the alleged violations cured." See paragraph 20 of the Park Affidavit (Exhibit F).

14.     Cho also submitted an affidavit in support of Tenant's request for a *Yellowstone* injunction. A copy said affidavit is annexed hereto as Exhibit G.

15.     Cho stated that he is a licensed architect and founder of KLC Architects PC, who "on or about February 1, 2017," contracted with the Tenant "to address the myriad alleged laundry list of violations contained in the NOC." See paragraphs 1 and two of the Cho affidavit (Exhibit G).

16.     Cho further stated in his affidavit as follows:

> "9. However, the alleged violations/breaches that require the involvement of the New York City Department of Buildings require investigation (i.e., pulling plans and approvals for work on the Premises) and said investigation and action to take curative steps is still an ongoing process. For example, an expediter is in the process of being retained to expedite the obtaining of permits and any certificates of occupancy necessary cure the alleged violations/breaches.
>
> 10. Based on my discussions with the expediter and my experience with the New York City Department of Buildings

> regarding similar matters, the time given to cure the violations, February 28,2 017, is woefully insufficient and will not allow sufficient time needed for : (1) the required architectural plans to be filed: (2) the architectural plans to be reviewed by the Department of Buildings for approval; (3) obtaining the necessary permits for repairs and renovations; (4) hiring the required contractors and sub-contractors to make the repairs and renovations; (5) for the repairs and renovations to be done to the Premises; and (6) for the Department of Buildings to inspect the repairs and renovations in order to obtain the certificates of occupancy.
>
> 11. At all relevant times, the plaintiff, my firm, and expediter, are working diligently to get all the work completed." *See* Exhibit G.

17.     In the complaint that accompanied Tenant's order to show cause, Tenant readily acknowledged that:

> "Some of the remaining violations set forth in the Notice to Cure require (1) architectural plans to be filed with the New York City Department of Buildings for review; (2) the architectural plans to be reviewed by the Department of Buildings for approval (3) obtaining the necessary permits for repairs and renovations; (4) hiring the required contractors and sub-contractors to make the repairs and renovations; (5) for the repairs and renovations to be done to the Premises; and (6) for the Department of Buildings to inspect the repairs and renovations in order to obtain the certificates of occupancy;. The matters requiring New York City Department of Buildings involvement cannot be completed with the thirty (30) day cure period of which approximately 13 days remain."

*See* NYSCEF Doc. 1.

18.     Technically speaking, there is a provision in the Lease that says notwithstanding the Landlord's service of a notice to cure, where the Tenant has had actual or constructive knowledge of the violation for a period in excess of 30 days, the Landlord need not serve a notice to cure. *See* Article 2.0 of the Lease (NYSCEF Doc. 2).

19.     In the Supreme Court case, the Landlord took a position that was specifically without prejudice to their right to establish that the Tenant had both constructive and actual knowledge of some of the breaches for a period in excess of 30 days by virtue of the fact that it was Tenant who created most all of the breaches (*e.g.*, removal of a staircase, and relocation of same, which was done without obtaining the necessary sign offs, and without obtaining the requisite amendment to the certificate of occupancy).

20.     Landlord consented to Tenant's request for an interim stay pending the hearing on the order to show cause for a *Yellowstone* injunction.

21.     After the hearing, an on-the-record ruling of the Court held as follows:

> "I am going to extend the *Yellowstone* injunction on the condition that the tenant act expeditiously to cure - - to complete the cures that are set forth in the notice. I recognize that some of these cures require - - necessarily require more than 30 days, but if you dawdle, that protection is not going to be available to the tenant. So, let's be clear about that. You have to move expeditiously with respect to getting your plans and getting the Department of Buildings' approvals and all of those kinds of things in moving ahead with the work that has to be done, if any."

(NYSCEF Doc. 50, P. 33:L. 6-17).

22.     With respect to the insurance defaults, the Court stated that "my ruling with respect to the insurance is that there is a question of fact as to whether or not it's covered - - as to whether or not the insurance is adequate." (NYSCEF Doc. 50, P. 36:L. 8-10).

23.     Justice Sherwood subsequently issued a decision and order supplementing the decision from the bench, by order dated April 12, 2017 (NYSCEF Doc. 54). Therein, the Court directed as follows:

> "The cure period is stayed conditioned on defendant's continuing to pay the rent as it becomes due and proceed

> with all deliberate speed to cure the remaining violations;
> and it is further ordered that plaintiff proceed in good faith
> to cure all specifically identified violations of the Lease and
> that plaintiff seek all necessary consents from the Landlord
> which consent shall not be withheld unreasonably."

See NYSCEF Doc. 54 (p. 5).

24.     Notwithstanding the aforementioned March decision and order of the Court, the referenced "sign offs" were not sent to the Landlord until three months later, in June of 2017.

25.     Specifically, in June 2017, Tenant sent Landlord drawings for an Alt-2 application for the kitchen exhaust. The Landlord provided comments on the Tenant's Alt-2 submission, and Tenant replied to said comments. The Landlord approved the application as requested.

26.     Tenant thereafter submitted additional proposed "revisions" to the kitchen exhaust plans that had already been approved by the Landlord.  However, prior to receiving any of Landlord's comments on the Tenant's proposed revisions, Tenant's attorney wrote that Tenant intended to move forward on the revised plans "with the understanding that the changes submitted June 5 did not require any additional approval." Annexed hereto as Exhibit H is a copy of the June 16, 2017 email from the Tenant's attorney confirming same.

27.     Review of the Tenant's purported "revisions" revealed that these were not revisions at all. In fact, these purported "revisions" were new drawings for an Alt-1 application (as opposed to the original Alt-2 application).

28.     Accordingly, by email dated June 16, 2017, Landlord's attorney responded to Tenant's attorney stating that it was a "nice try" to attempt to deem the completely new set of drawings approved, without seeking, let alone obtaining, the requisite Landlord's consent for what was now an Alt-1 application.

6

29.     Landlord's attorney informed Tenant's attorney that as a result of the extensive changes submitted by Tenant, Landlord would need another week to comment on Tenant's new Alt-1 application. In the same June 16, 2017 email to Tenant's attorney, Landlord noted three additional problems that Tenant had failed to address relating to (1) questions regarding the roof layout for FDNY access compliance; (2) the second floor occupant load presented was inconsistent with the property's current certificate of occupancy; and (3) the exits were not up to code and may need an additional plan to allow the bottom landing of each stair to be unenclosed. A copy of said June 16, 2017 email to Tenant's attorney is annexed hereto as Exhibit I.

30.     Upon my reviewing of Tenant's newly submitted Alt-1 plans, it became apparent that Tenant failed to provide the Landlord with all of the plans that Tenant intended to file with the Department of Buildings ("DOB"). Accordingly, by email dated June 19, 2017, Landlord's attorney wrote to Tenant's attorney stating:

> "It seems fairly evident that the last set of plans that you sent me is part of a larger set to be filed with the DOB. Please send me the entire set so that I may forward same to my client for their review and consideration."

A copy of said June 19, 2017 email to Tenant's attorney is annexed hereto as Exhibit J.

31.     That same day, I wrote directly to Tenant's attorney and his architect, detailing the deficiencies with Tenant's Alt-1 submission, as follows:

> The only drawing that has been submitted, reviewed and approved by us to date are: A-001.00 dated 6/1/17 that are to be filed as an alt-2 with a workscope to change the location of the kitchen exhaust ducts to be up [to] the appropriate mechanical code. That drawing shows only the location of kitchen duct fans on the roof.
>
> We received an additional drawing A-102 which has travel distance calculations, uses for cellar, first,

7

> second and roof, and does NOT appropriately resolve the egress issues, use issues on the 2nd floor, ADA issues, occupancy issues and seems to backdoor a work table on the 2nd floor that is a disguised seating area. That drawing seems to be part of a larger set.
>
> So to be clear, the filing of anything other than drawing A-001.00 without Landlord's review and consent will be considered defrauding the DOB and we will immediately move for relief from the court and pursue remedies with the DOB.

A copy of this June 19, 2017 is attached hereto as Exhibit K.

32.    In response to the June 19, 2017 emails, Tenant thereafter (finally) submitted a full set of its alteration plans. On July 7, 2017, Landlord wrote to Tenant regarding Tenant's request for approval of the plans submitted on June 23, 2017, stating, in pertinent part, as follows:

> At the outset, I believe that your client's actions show a disregard for, if not contempt of, the decision and order of Judge Sherwood. In support of this conclusion I note that despite the passage of over two-and-a-half months, your client has failed to expeditiously do what is expected, if not required, in order to comply with the court's order.
>
> Further, despite receiving ample advance notice, your client refused to permit access to my client and their consultant. As I am sure you recognize, the landlord cannot pass comment on the Alt-1 application until access is permitted to the landlord and their consultant to inspect the premises for visual confirmation. Despite ample advance notice, the inexplicable refusal to permit my client and their consultant access, and turning them away, demonstrates, in my opinion, a willful disobedience of the mandate of the court, as well as a disregard for the tenant's lease obligations.
>
> As you know, the lease agreement requires that the tenant provide certificates of insurance in accordance

with the terms and conditions of said lease. While you have apparently provided some such documents the tenant has failed to provide certificates of insurance for most of the entire duration of the tenancy, and indeed, seems to willfully disregard the lease requirements.

In an effort to avoid any misunderstanding regarding the tenant's insurance obligations, please provide me within five days of this communication copies of the required certificates from the inception of the tenant's lease to date. This should be relatively simple task, as it only requires an email or phone call to the tenant's insurance broker to produce same. Finally, I again ask that you caution your client against undertaking any work that is not in compliance with the lease, or in violation of applicable law.

A copy of the July 7, 2017 email to Tenant's prior counsel is annexed hereto as Exhibit L.

33.    On July 11, 2017, Landlord's engineer, Vidaris, marked-up Tenant's plans showing the numerous deficiencies in Tenant's submission. A copy Vidaris's mark-up of Tenant's plans is attached hereto as Exhibit M.

34.    After Landlord was finally permitted access to inspect the Premises, a follow-up letter was sent, on August 31, 2017, further detailing in an eight-page correspondence, the numerous defects with Tenant's proposed submission. A copy the August 31, 2017 letter is attached hereto as Exhibit N.

35.    Landlord thereafter served an amended answer in the Supreme Court case on September 1, 2017 (NYSCEF Doc. 94).

36.    Landlord served notices of discovery and inspection, and notices of deposition which Tenant ignored. Despite the passage of almost a month after the service of the

Landlord's notice of discovery and inspection, dated August 17, 2017 Tenant did nothing to comply until September 2017.

37.     Tenant thereafter changed attorneys, and the law firm of Michael S. Kimm were substituted into the case on or about September 22, 2017 (NYSCEF Doc. No. 97).

38.     In November 2017, Landlord's attorneys drafted an order to show cause based upon Tenant's failure to (a) proceed with all deliberate speed to cure the violations in the NOC, and (b) proceed in good faith to cure all specifically identified violations of the lease. Over seven months had passed since the March 27, 2017 order, and it appeared that Tenant failed to make any serious effort to cure the following breaches set forth in the NOC:

(a)     Regarding approval for DOB application Alt. II 122418758, which was signed off by the DOB, but no approval of work was requested nor granted by Landlord.

(b)     Failing to occupy the second (2nd) floor of the Premises in compliance with the 2014 NYC Building Code and International Code Counsel/American National Standards Institute A117.1-2009.

(c)     Failing to provide a fire-rated enclosed western staircase for egress from the second (2nd) floor based on the stated twelve (12) person occupancy in Tenant's Alt. I application.

(d)     Failing to modify the cellar stars to provide proper egress per NYC Building Code Section 102.3.1.

(e)     Failing to provide sufficient detail with respect to the fire-rating of the new ceilings on the first (1st) and second (2nd) floors of the Premises, as required by NYC Building Code Section 508.3 and Table 508.3.3.

(f)     Using the cellar of the Premises as an office, in violation of the Certificate of Occupancy.

(g)     Using the cellar of the Premises for food preparation, in violation of the Certificate of Occupancy.

(h)     Failing to provide Landlord with records relating to Tenant's cleaning of the kitchen exhaust systems.

(i)  Failing to withdraw or obtain signoff on DOB application Alt. II 104074822.

(j)  Failing to withdraw DOB application Alt. II 104074822, which was improperly filed as an Alt. II application.

(k)  Failing to withdraw or obtain signoff on DOB application Alt. II 104293319.

(l)  Failing to withdraw or obtain signoff on DOB application Alt. II 100427441.

(m)  Failing to withdraw or obtain signoff on DOB application Alt. II 100606275.

(n)  Failing to withdraw or obtain signoff on DOB application Alt. II 100952541.

(o)  Failing to withdraw or obtain signoff on DOB application Alt. II 103069288.

(p)  Failing to properly address the exit stairs and fire separation/rating for the work completed in connection with Tenant's DOB application Alt. II 120591305, which was misfiled as an Alt. II application and performed without Landlord's consent.

(q)  Failing to maintain the proper levels of insurance at the Premises and/or failing to provide Landlord with proof of insurance.

(r)  Submitting an Alt. I application that changes the certificate of occupancy, to the detriment of Landlord, in contravention of the Lease and the March 27, 2017 order.

(s)  Submitting Alt. I and Alt. II applications that show material on the roof, which is not part of the Premises.

39.    As of November 2017, the following ECB violations were still outstanding:

(1) 040533615R (sanitation violation); (2) 0880703387 (health violation); and (3) 040533614P

(sanitation violation). Furthermore, on July 14, 2017, Landlord and its agents inspected the

Premises and observed existing conditions that suggested that two violations had recurred since

they were initially cured by Tenant; violation 34923839M (failure to provide unobstructed egress passageway), and violation 34923837Z (illegal occupancy in the cellar level).

40.     On November 2, 2017, Landlord incurred a $2,000.00 penalty for Tenant's failure to correct ECB violation 0880703387.  A copy of the Notice of Violation and Hearing for Civil Penalties Only is attached hereto as Exhibit O.

41.     Accordingly, on November 8, 2017, I executed an affidavit in support of Landlord's order to show cause to vacate the *Yellowstone* based upon the Tenant's failure to comply with the conditions of the stay, wherein I submitted the following:

> 13. Plaintiff's conduct throughout the course of this litigation has been calculated to delay an expeditious resolution on the merits. In an effort to observe whether Plaintiff complied with the Court's orders, Defendant requested access for Defendant and its agents to inspect the Premises on June 23, 2017. However, Defendant and its agents were turned away by Plaintiff upon their arrival for the inspection, and were not permitted access. As a result, Defendant was unable to gain access to fully inspect the Premises until the Plaintiff finally permitted same, on July 14, 2017.

> 14. Plaintiff has also violated the Court's orders by failing to submit plans that comport with the rules and regulations of the DOB or the requirements under the Lease, thereby preventing Plaintiff from expeditiously obtaining approvals for its plans from the DOB. Even if Plaintiff's plans comported with the rules and regulations of the DOB and the requirements under the Lease (which they do not), Plaintiff did not submit its proposed work plans for nearly three (3) months <u>after</u> being directed by the Court to move expeditiously!

> … Plaintiff submitted an incomplete, defective set of plans in early June, 2017. Defendant's attorney expeditiously notified Plaintiff of the deficiencies in its plans by email, dated June 19, 2017. A copy of the June 19, 2017 email is attached hereto as Exhibit F. Thereafter, Plaintiff submitted a complete (albeit, still defective) set of plans.  Again,

Defendant's attorney promptly notified Plaintiff of the numerous deficiencies in its plans, by email, dated July 7, 2017 and by letter, dated August 31, 2017. Copies of the July 7, 2019 email and the August 31, 2017 letter are attached hereto as Exhibits H & J, respectively. <u>At the time of the parties' preliminary conference, on September 19, 2017, Plaintiff had still not provided Defendant with updated plans that comported with the rules and regulations of the DOB and the requirements under the Lease.</u>

… the preliminary conference order, dated September 19, 2017, required Plaintiff to submit the proper plans to Defendant, no later than September 26, 2017. However, <u>Plaintiff, once again, disregarded the authority of this Court, and failed to submit its updated plans until October 11, 2017.</u>

16. Furthermore, the plans submitted by Plaintiff on October 11, 2017, which were submitted under the same drawing number and date as Plaintiff's plans submitted in June, 2017, fail to address the issues raised in the August 31, 2017 email from Defendant's counsel. Plaintiff's October 11, 2017 belated submission is a default under the parties' September 19, 2017 preliminary conference order. It also serves as another example of: (1) Plaintiff's failure to cure the violations alleged in the Notice to Cure, expeditiously, as required by the Court's March 27, 2017 order; (2) Plaintiff's failure to proceed with deliberate speed to cure remaining violations, as required by the April 12, 2017 order; and (3) Plaintiff's failure to proceed in good faith to cure all specifically identified violations of the Lease, as required by the April 12, 2017 order. Plaintiff's plans are still deficient for the reasons set forth in Defendant's August 31, 2017 letter, and Plaintiff has made no meaningful effort to correct same, despite the passage of almost two additional months, for a total delay of five months.

17. Moreover, the scope of work in the plans submitted by Plaintiff on October 11, 2017 far exceed that which Defendant might be required to consent to. Pursuant to the Court's decision on the record, dated March 27, 2017, Defendant is not required "to do anything more than the minimum that landlord has to do in order to satisfy the conditions required for the work to go forward to cure the defaults." *See* Exhibit B, P. 33: L. 21-24.

13

18. Section 4.00 of the Lease provides, in relevant part:

Tenant shall not be permitted to make any structural changes to the demised premises without the express written consent of the Landlord.

19. The scope of work in Plaintiff's October 11, 2017 submission contains structural work that requires Defendant's express written consent, pursuant to Section 4.00 of the Lease. Furthermore, under DOB guidelines, Plaintiff is required to make additional structural alterations to legalize the work that was performed at the Premises without Defendant's consent. Given Plaintiff's history of skirting laws and regulations, Defendant is uncomfortable granting Plaintiff consent to perform the substantial alterations contained in the October 11, 2017 submission.

20. Section 4.01 of the Lease provides, in relevant part:

Tenant in the use, occupation and control of the demised premises and in the prosecution or conduct of any business therein shall comply with all requirements of all laws , orders, ordinances, rules and regulations of the federal, state, county and municipal authorities and with any direction or certificate of occupancy, pursuant to law, of any public officer o[r] officers, which shall impose any duty upon the Tenant or Landlord with respect to the demised premises for the use, occupation or control thereof or the conduct of any business therein, and shall not make or suffer any waste, or any illegal or offensive use of the demised premises or any part thereof.

21. Accordingly, pursuant to Section 4.01 of the Lease, Plaintiff must comply with the current Certificate of Occupancy for the Premises (C of O #68996). A copy of C of O 68996 is attached hereto as Exhibit P.

22. However, Plaintiff's October 11, 2017 submission attempts to change the Certificate of Occupancy for the Premises in a way that makes the use of the second floor accessory to the commercial space. Furthermore, the change in the Certificate of Occupancy would trigger compliance with the Americans with Disabilities Act I if Defendant were to attempt to convert the second floor back to commercial

14

space. If Plaintiff was permitted to carry out its October 11, 2017 plans, Defendant would have to undertake substantial work to restore the Premises to its current legal use. Accordingly, the plans submitted by Plaintiff constitute waste, which is prohibited by Section 4.01 of the Lease. Clearly, the October 11, 2017 plans are outside the scope of the submissions required by the Court's orders.

42.     Landlord submitted the proposed order to show cause on November 9, 2017, seeking, inter alia, renewal of its prior request to vacate the *Yellowstone* injunction. The order to show cause (NYSCEF Doc. No. 119), was returnable November 27, 2017, but neither Tenant nor its attorneys appeared. Not wishing to have the motion granted on default, Defendant contacted Tenant's attorneys, and informed the Court accordingly. The matter was therefore rescheduled and heard by the Court on December 13, 2017.

43.     A transcript of the December 13, 2017 hearing, which appears at NYSCEF Doc. No. 129, included the following statements and admissions:[1]

- [Mr. Kim] "we are putting in seating and we are installing a fire sprinkler. So when that gets approved, that second-floor issue will be moot." (P. 43:L3-5);

- [In response to the judge's inquiry as to "whether or not the work has been done"] "It hasn't been, judge" (P. 43:L. 13-15);

- [In response to the Court's query as to what type of alteration permits are required, Mr. Kimm states] "We need Alt-1 and Alt-2, but Alt-2 requires DOB certification, Alt-1 is self-certifying, judge." P. 47:L. 10-12);

- [In response to the Court's query for a suggestion that would give the Court "a pathway to resolution," Kimm states] "My suggestion has always been let us file the Alt-1 and Alt-2, let it play out in the Department of Buildings, and once the Department of Buildings response, it may be all moot." (P. 54:L. 3-7) (emphasis supplied).

---

[1]   "P" and "L" refer to the page and line number of the transcript (NYSCEF document number 129).

44.     As may be ascertained from the foregoing, Tenant, by its counsel, now acknowledged the need for <u>both</u> Alt-1 and Alt-2 applications to be submitted.  While Tenant was making every effort to avoid a hearing, it became evident that an expert hearing would be the best way to permit the Court to determine the Landlord's request to vacate the *Yellowstone*.[2]

45.     The expert witness hearing proceeded before the Court on February 15, 2018 (a transcript of the hearing appears at NYSCEF Doc. No. 135). At the hearing, Landlord presented evidence demonstrating that substantial alterations had already been made by the Tenant over a period of years, without regard to requirements of the DOB. Expert testimony demonstrated that there were several alterations that constituted use contrary to (or at least different than) the certificate of occupancy ("C of O"); accordingly, those alterations should have required an Alt-1 application, as well as an amendment to the C of O.

46.     Contradicting Tenant's original architect (Cho), who had previously submitted an affidavit to the Court attesting to the need of both Alt-1 and Alt-2 permits, Tenant attempted to take a new tact through a different expert, Bryan Winter ("Winter") at the expert witness hearing that any and all necessary work could allegedly be completed using an Alt-2 self-certifying application process. In this regard, note that Jay Cho's[3] original affidavit in support of the *Yellowstone* application ("NYSCEF Doc. No. 16") indicated the following:

- Cho is a licensed architect and his company was contracted to "address the myriad alleged laundry list of violations contained in the notice to cure

---

[2]     Prior to the hearing, both sides availed themselves of the opportunity to depose the expert witnesses that would be testifying. However, Tenant failed to produce its principal (Park) or its architect (Cho) for examination.

[3]     Cho is the Tenant's architect who submitted an affidavit on the Tenant's behalf in support of the initial request for a *Yellowstone*. As demonstrated in the subsequent submissions to Supreme Court, in his affidavit addressing the Landlord's Notice to Cure, Cho readily acknowledged the existence of a number of violations that were tenant caused, and which needed to be (but had not been) addressed. Cho's affidavit was, to a large extent, at odds with Tenant's new expert witness, Bryan Winter, who at the hearing attempted to diminish Cho's admissions.

issued by the Landlord;" *see* paragraph 1 and 2 of the Cho Affidavit (NYSCEF Doc. No. 16);

- Cho's affidavit was submitted with personal knowledge of the facts concerning Plaintiff's lease of the premises and his review of the notice to cure (NYSCEF Doc. No. 16, paragraphs 3-6).

- After reviewing the notice to cure "over the course of several days," Cho sent a letter to the Landlord and its attorneys in response to the allegations in the notice to cure, referencing his letter of February 3, 2017 (NYSCEF Doc. No. 19) (NYSCEF Doc. No. 16, paragraph 7);

- The referenced letter (NYSCEF Doc. No. 19) specifically indicated that Cho had been retained for the "preparing the C of O amendment." *See* page 3 of the Cho February 3, 2017 letter (NYSCEF Doc. No. 19).

47.     Incredibly, disregarding the prior sworn affidavit and representations by the actual architect retained to address the very issues before Judge Sherwood, Tenant presented an entirely different theory at the hearing. That theory, in essence, was that any and all necessary work to be done at the premises could be done by the simple filing of a self-certifying Alt-2 application. Tenant advanced this new theory (which was at odds with Cho's previously submitted affidavit), without regard for the facts or applicable law.

48.     For example, Mr. Winter (Tenant's expert witness) claimed throughout his direct examination that the work necessary to address the violations could be done without any need to amend the certificate of occupancy, or obtaining new C of O. However, on cross-examination, Winter was confronted with the fact that Cho had previously stated that the Landlord is "correct;" *i.e.*, a new certificate of occupancy would be required. *See* transcript from expert witness hearing (NYSCEF Doc. No. 135), P. 154:L. 7–P. 155:L. 3.[4]

---

[4]     In response to the very serious question of whether or not his testimony was of such a nature that he was willing "to stake the lives of patrons who come in and out of" the premises, Winter's response was "I haven't killed a baby lately." P. 155:L. 1-3.

49.     At the hearing on the order to show cause, Tenant's attorney reaffirmed that his "suggestion has always been [to let Tenant] file the Alt-1 and Alt-2 applications, and let the DOB respond." See NYSCEF Doc. 129, P. 54:L. 3-6.

50.     Recognizing that the expert witnesses for both parties had a difference of opinion (indeed, the Tenant's two expert witnesses, Cho and Winter had a difference of opinion between the two of them), the Court held an "evidentiary hearing" to determine whether the Tenant was able to satisfy its "ready, willing, and able obligation on the *Yellowstone*." NYSCEF Doc. 129, P. 49, L. 2-4, and P. 55, L. 6-8.

51.     By order dated February 16, 2018, Justice Sherwood granted the Landlord's order to show cause to renew, and upon renewal and the evidentiary hearing, denied the Landlord's order to show cause (NYSCEF Doc. 132),

> "… for the reasons stated in the transcript dated February 15, 2018 except that the injunction shall EXPIRE on March 15, 2018, if, prior to 5:00 p.m. on that day, Plaintiff has not filed with the New York City Department of Buildings a proper "Alt-2" certification relating to the subject property. Plaintiff shall act expeditiously to cure all violations that are the subject of this action. This order is without prejudice to Defendant moving to renew upon proof of failure to cure expeditiously."

See NYSCEF Doc. 132 (emphasis in original).

52.     Tenant did not request nor receive an extension of the aforementioned March 15, 2018 deadline. Tenant did not seek renewal, or reargument, <u>nor did it file a notice of appeal of the March 15, 2018 deadline contained in the February 16, 2018 order</u>.

53.     On March 1, 2018, Tenant filed a purported Notice of Compliance With Order filed 2-16-18 (NYSCEF Doc. 133) ("Notice of Compliance") which included an exhibit which appeared to be a printout from the DOB (NYSCEF. Doc. 134).

54.     On March 12, 2018, Landlord filed its notice of rejection with objections

(corrected) (NYSCEF Doc. 136). In Landlord's notice of rejection, a copy of which is annexed

hereto and incorporated herein as Exhibit P, Landlord went to great effort to detail why and how

the Tenant's Notice of Compliance was legally defective, stating the following:

> PLEASE TAKE NOTICE, that Defendant Delshah 461 Seventh Avenue, LLC ("Defendant") rejects the Plaintiff's "Notice of Compliance" with Order filed 2-16-18 re: Filing of Alt-2 Plans with DOB ("NOC") (NYSCEF Doc. No. 133), and in support of the foregoing, notes the following objections:

> 1.      The Defendant has received notification from the Department of Buildings ("DOB") that the proposed Alt-2 plans referenced by the Plaintiff's NOC were disapproved on March 1, 2018. Based upon the foregoing, it is readily apparent that the Plaintiff is not in compliance with the referenced order of the Court.

> 2.      Annexed hereto and incorporated herein as Exhibit A is a printout from the DOB website indicating that the application requested by the Tenant relating to Job Number 123191465 was, in fact, disapproved by the DOB on March 1, 2018.

> 3.      The Plaintiff's NOC is belied by the information provided and posted by the DOB on their website.

> 4.      While Plaintiff alleges in the NOC a purported "compliance" based upon the "filing of certain Alt-2 plans for renovation of the subject property," none of the plans or other documents referenced by the Plaintiff in its NOC have been provided to the Landlord or its attorneys. Production of the Alt-2 plans referenced in the NOC should have been provided to the Landlord or its attorney, pursuant to previously served and ongoing discovery demands, as well as based upon Article 4, Section 4.00 of the lease agreement between the parties requiring same.

> 5.      By decision and order of the Hon. O. Peter Sherwood dated April 12, 2017 (NYSCEF Doc. No. 54), Plaintiff was ordered to "proceed in good faith to cure all specifically

identified violations of the lease and … seek all necessary consents from the landlord which consent shall not be withheld unreasonably." By failing to provide any of the documents referenced by the proposed Alt-2 plans (as referenced by the NOC), Plaintiff has proceeded in a manner that lacks good faith and has intentionally sought to avoid obtaining any consent that might otherwise be necessary from the landlord, in violation of the aforementioned order.

6.      By notice of motion dated July 5, 2017, (NYSCEF Doc. No. 74), Plaintiff moved for a protective order seeking to vacate Defendant's notice of discovery and inspection and notices of deposition, and related relief. In connection with the aforementioned motion, Plaintiff specifically sought to vacate notices of deposition of Plaintiff's representative, Young H. Park, owner of 461 7th Ave. Market Inc., and Plaintiff's architect, Jay Cho, as well as production of documents (NYSCEF Doc. No. 84) which sought production of:

- Copies of the architectural plans and any related correspondence [(paragraphs 28, 29) (referencing the paragraph number of Defendants' demand for documents)];

- Copies of any and all communications/ correspondence/documentation demonstrating what Plaintiff did to obtain the necessary permits for repairs and renovations (paragraphs 30-32);

- Copies of any and all alteration applications for the period of August 1, 2003 to date, including any and all supporting documentation submitted in support of same (paragraph 33);

- Copies of any and all communications/ correspondence/documentation referencing what matters required New York City Department of Buildings involvement (paragraph 35);

- Copies of any and all communications/ correspondence/documentation relating to "the progress of cure work through plaintiff's architect" (paragraph 40);

20

- Copies of any and all communications/correspondence/documentation demonstrating that the Plaintiff "is in the process of curing those alleged violations" (paragraph 42);

- Copies of any and all communications/correspondence/documentation relating to "any applications filed by or on behalf of the Plaintiff in any way related to any work in or about the premises that requires permits, including all communications/correspondence/documentation relating to any responses received from any city agency or Plaintiff's architect or contractor for the period of August 1, 2003 through including the present date" (paragraph 43). See NYSCEF Doc. No. 84.

7.     By decision and order dated August 2, 2017 (NYSCEF Doc. No. 88), Justice Sherwood denied the motion of the Plaintiff (Motion Seq. #3) for an order to vacate Defendant's discovery request and for a protective order.

8.     Notwithstanding the clear and unequivocal document production demand and order of the Court denying Plaintiff's motion to vacate same and for a protective order, Plaintiff has, to date, failed to provide all of the documents demanded. Moreover, none of the documents relating to the proposed Alt-2 plans referenced by the NOC were submitted to the Landlord, and, at deposition of Plaintiff's expert, we learned of and demanded a report prepared by Plaintiff's expert firm, which remains unproduced.

9.     The failure to provide the documents demanded constitutes a failure to comply with the aforementioned document production demand, and disregards the order denying Plaintiff's motion to vacate same; thus, it appears to be in contempt of the Court's prior orders.

10.     Upon information and belief, based upon the testimony provided by the expert witnesses at the hearing on February 15, 2018, the proposed Alt-2 applications referenced in Plaintiffs' NOC are insufficient to properly address and rectify the Tenant's prior illegal alterations.

11.    Plaintiff has failed to provide any of the plans and/or other documents submitted to the DOB in support of the newly proposed Alt-2 applications to the Landlord or their attorney. The failure to provide the Landlord with a full set of the Alt-2 plans and copies of all documents submitted in conjunction therewith smacks of bad faith, which is in derogation of the intent, if not the express terms, of the prior orders of the Court.

12.    Pursuant to the Certificate of Occupancy number 68996, the subject building is a two–story retail building with accessory cellar storage, retail on the first floor, and a limited occupant load of three persons on the second story. Based upon testimony given at the hearing on February 15, 2018, it appears that (i) the tenant hired architects who filed a series of Alt-2 applications, some of which were under professional certification that materially altered egress conditions by relocating and adding staircases, (ii) increased occupant loads on the cellar level and second story, and (iii) reclassified occupancies. In doing so, it appears that the Tenant circumvented the requirements relating to the need to obtain a new Certificate of Occupancy, and circumvented required Code and accessibility upgrades after exceeding cost thresholds. (Specifically, the aforementioned applications exceeded the 50% thresholds of Administrative Code Section 27–123.1, which would require accessibility to the second story).

13.    It appears that the aforementioned three Alt-2 applications (referenced in ¶ 14 below), which should have been filed as Alt-1 applications, cannot be corrected by the filing of new Alt-2 applications. Accordingly, it is evident that the newly proposed Alt-2 applications filed cannot, and will not, legalize those unlawful alterations.

14.    Heretofore, there were prior applications filed pertaining to the premises, which were unlawfully filed as Alt-2 applications (instead of Alt-1 applications) as follows:

| | Job # | Filed | Type | Exam | Status | Issue(s) |
|---|---|---|---|---|---|---|
| A. | 104074822 | 4/5/05 | Alt-2 | Pro-cert D14 | Permit-entire | • Occupant load inconsistent with CO:[5]<br>   ○ CO limits 2nd story to 3 persons<br>   ○ approved plans show 34 occupants on 2nd story |
| B. | 120002852 | 4/1/09 | Alt-2 | Plan Exam D14 | Signed off 3/17/10 | • Occupant load inconsistent with CO:[6]<br>   ○ CO limits 2nd story to 3 persons<br>   ○ approved plans show 34 occupants on 2nd story |
| C. | 120591305 | 2/4/11 | Alt-2 | Pro-cert D14 | Signed off 4/22/14 | • Occupant load inconsistent with CO:[7]<br>   ○ CO limits 2nd story to 3 persons<br>   ○ approved plans show 34 occupants on 2nd story<br>• Change of occupancy in cellar: [8]<br>   ○ CO limits cellar to storage (Group S)<br>   ○ approved plans show employee office and multiple food prep sinks in cellar (Group B)<br>• Change of occupancy on 2nd story:[9]<br>   ○ CO limits 2nd story to light merchandise (display and sale) (Group M)<br>   ○ approved plans show 2nd story as customer seating and accessory cooking for delicatessen (Group B) |

---

[5] Contrary to 27-217(a)/ 28-118.3.2

[6] Contrary to 27-217(a)/ 28-118.3.2

[7] Contrary to 28-118.3.2.

[8] Contrary to 28-118.3.1 (BB 2009-025 does not provide relief for to changes in cellar level).

[9] Contrary to 28-118.3.1 (BB 2009-025 does not provide relief for changes on 2nd story level)

|  |  |  |  |  |  |  |
|--|--|--|--|--|--|--|

The latest proposed Alt-2 application does not address, let alone legalize, these alterations.

15.    Pursuant to the provisions of Article 4, Section 4.00 of the Tenant's lease, the "tenant shall not be permitted to make any structural changes to the demised premises without the express written consent of the landlord." Based upon the testimony given at the hearing on February 15, 2018, it appears that the Tenant permitted structural changes to the demised premises without the express written consent of the Landlord, and further, that the Tenant filed the above mentioned Alt-2 applications without the express written consent of the Landlord, and that those alterations were, in fact, structural changes. By filing new Alt-2 applications without providing copies of the plans and/or documents submitted to the DOB in support of the newly proposed Alt-2 applications to the Landlord or their attorney, the Tenant is effectively preventing the Landlord from passing upon the propriety of the plans and/or proposed work, and further, has deprived the Landlord of the right to withhold consent (if appropriate) in accordance with the parties' lease agreement.

16.    By letter dated March 8, 2018, the Landlord notified the Commissioner of the DOB that Landlord reasonably believes that the referenced multiple applications filed on behalf of the Tenant were improperly filed as Alt-2s, instead of Alt-1s. Annexed hereto and incorporated herein as Exhibit B is a true copy of said letter to the DOB (with exhibits).

PLEASE TAKE FURTHER NOTICE, that based upon the foregoing, Defendant rejects the Plaintiff's purported "Notice of Compliance," and Defendant will avail itself of its rights and/or remedies provided by the prior order of the Hon. O Peter Sherwood, as well as any and all rights and remedies provided by law and/or equity.

55.    Tenant took no steps to address the enumerated defects forming the basis of

the Notice of Rejection. Based upon Justice Sherwood's February 16, 2018 order (NYSCEF Doc.

132), the *Yellowstone* injunction expired on March 15, 2018. Because, technically, at the time the

*Yellowstone* injunction issued, the Tenant still had six days remaining to "cure" while the Yellowstone expired on March 15, the cure period did not expire until six days later, on March 21, 2018.

56.     Tenant took no steps in the intervening remaining days subsequent to expiration of the *Yellowstone* and prior to the expiration of the cure period, to do anything to preserve its tenancy. Accordingly, Landlord served Tenant with a Notice of Termination dated March 23, 2018, which expired April 12, 2018 ("NOT") (*See* NYSCEF Doc. 141).

57.     Even though the NOT was served on March 23, 2018, Tenant still did nothing until weeks later when, on April 4, 2018, Tenant filed an order to show cause (Motion Seq. 005, NYSCEF Doc. 139) unrelated to any effort to preserve the tenancy (which had already been lawfully terminated), but rather, seeking to strike Landlord's answer in the Supreme Court action, as well as other relief.

58.     Subsequently, Tenant filed an Order to Show Cause (Mot. Seq. 005, NYSCEF Doc. 139) seeking, inter alia, to strike Defendant's answer due to Defendant's alleged "harassment and interference," and enjoining Defendant from serving any further notices, and fees and costs.

59.     In opposition to the belated order to show cause, Landlord submitted that by virtue of the NOT, any period of time that the Tenant may have had to cure had expired, and Plaintiff's tenancy was terminated. A copy of the said NOT is annexed hereto as Exhibit Q, with attached insurance matrix.

60.     In its opposition (NYSCEF Doc. 164), Landlord submitted that the Tenant's belated order to show cause disregarded the following facts:

25

- Landlord's Notice of Rejection of Tenant's Notice of [purported] compliance demonstrates that the DOB rejected the Alt-2 application referenced in Plaintiff's Notice of [purported] Compliance;

- Tenant is presumed to have knowledge of the DOB's initial rejection of its Alt-2 application (which was posted on the DOB website);

- Tenant ignored and otherwise failed to respond to the Landlord's Notice of Rejection;

- Tenant failed to comply with Justice Sherwood's order prior to the expiration of the *Yellowstone* injunction;

- Tenant's time to cure expired, as a matter of law, on March 21, 2018;

- Landlord served a Notice of Termination on March 23, 2018;

- The Notice of Termination expired, by its terms, on April 12, 2018;

- Tenant failed to take any steps to extend the *Yellowstone* previously granted by Supreme Court;

- Tenant failed to take any steps to obtain a new stay or other appropriate injunctive relief from any Court.

61.    In said opposition papers, Landlord also noted the following:

- Tenant failed to provide the requisite discovery demanded, notwithstanding the fact that the Tenant's motion for a protective order had been denied;

- Only one of two Alt-2 applications was professionally certified (BIN 1015221 was not professionally certified, which resulted in a "stop work order");

- Tenant failed to address, let alone explain, why it would proceed by order to show cause seeking relief which bears no relationship to the termination of its tenancy, instead of timely seeking appropriate relief;

- Tenant misrepresented to Justice Sherwood that the owner's signature was not necessary for an Alt-2 application (see NYSCEF Doc. 135, P. 176, L. 3-8).

- Tenant held over in possession of the Premises after expiration of its term, based upon service of a valid NOT. Landlord was therefore entitled to pursue a summary remedy in the context of a holdover proceeding, to obtain possession of the Premises.

- Tenant's order to show cause was heard before Justice Sherwood on April 20, 2018, and a transcript of the hearing appears at NYSCEF Doc. 195 (the "Hearing").

62.     At the Hearing, Landlord noted that Tenant was aware of the DOB schedule, and not only failed to timely seek appropriate relief, but instead, moved for an improper remedy; Justice Sherwood observed that as of March 8, 2018, Tenant still did not have a proper application before the DOB. NYSCEF Doc. 195, P. 50, L. 22-23. The Court recognized that "if [the stay] was going to be extended [Tenant] had an obligation to come before the Court and say I need more time." NYSCEF Doc. 195, P. 51, L. 14-17.

63.     At the Hearing, Landlord outlined several glaring deficiencies in the Tenant's submission to the DOB as follows:

- The prior order of the court directed a professional certification, also known as a self-certifying Alt-2 application. See NYSCEF Doc. 195, P. 8, L. 6 – 16;

- DOB bulletin 2016-010 sets forth four items that must accompany an Alt-2 application. Page 2, paragraph 3(a) lists the required items checklist for professional certification;

- Among the forms required, is a "TR-8 Form," a technical report regarding energy. The Tenant did not submit its TR-8 until March 30, two weeks after the expiration of the Yellowstone. NYSCEF Doc. 195, P. 10, L. 15-18;

- Two additional forms, the POC-1 and PCI-1, were never submitted in connection with the larger of the two jobs (the one ending in 465). Id., P. 10, L. 21-24;

- A "TM-5," which is the sign off from the New York City Fire Department, was never timely filed;

- Despite phone calls and emails, Tenant and his attorney failed to provide Landlord with a copy of the Alt-2 application that was the subject of the Hearing;

- Tenant does not have the right to utilize the rooftop space in the premises; it is not part of the demised premises pursuant to the parties' lease

agreement, and Tenant does not pay any rent for any portion of the rooftop space;

- In an effort to obtain approval from the FDNY as part of their Alt-2 application, Tenant was required to denote the location of where the work was going to take place, and Tenant specified space and submitted plans relating to work being done on the rooftop without submitting said plans to Landlord for their approval.

64.     When Justice Sherwood asked whether or not it was true that Tenant elected not to provide the Landlord with anything relating to their Alt-2 application, Tenant admitted that it "elected not to provide [the landlord] with anything." NYSCEF Doc. 195, P. 20, L. 3-14.

65.     The DOB website demonstrated that three essential documents, the TR-8, PW-3, and PW-2 (which are all critical parts of an Alt-2 application) were not submitted until _after_ both the cure period expired, and after the Landlord served its termination notice. NYSCEF Doc. 195, P. 41, L. 22 – P. 42, L. 2.

66.     Based upon the records maintained by the DOB, it was indisputable that the Tenant's architect, at the very least, knew as of March 1, that Tenant had submitted a defective application.

67.     At the conclusion of the hearing, the Court specifically stated [to Tenant's attorney] "as of March 8, you didn't have a proper application before DOB." NYSCEF Doc. 195, P. 50, L. 22-23, 25. Justice Sherwood specifically "made a finding that [Tenant] didn't complete a proper application in the timeline that [the Court] gave the Tenant, and let that date come and go." NYSCEF Doc. 195, P. 50, L. 14-20, P.  51, L. 18-20.

68.     The Court's on-the-record determination was reduced to a written order (NYSCEF Doc. 187) which held as follows:

> "By order dated February 16. 2018, this court continued to
> March 15, 2018 a _Yellowstone_ injunction which had been in

place for sixteen months in order to allow plaintiff to file "a proper 'Alt-2 [type application] relating to the subject property" (NYSCEF Doc. No. 147). This motion sequence number 005 brought on by Order to Show Cause was e-filed on April 4, 2018 after the *Yellowstone* injunction had expired.

A Type 2 permit involves a self-certification permit application procedure which according to plaintiff does not require the consent of the landlord (NYSCEF Doc. No. 135, p. 176). It now appears that for much of the work required here, self-certification is not authorized and landlord consent may be required (*see* NYSCEF Doc. Nos. 181 and 177).

At the time of the evidentiary hearing that resulted in issuance of the February 16, 2018 order, the court commented that plaintiff had done little to cure the then existing violations for over a year and as a result, the court would allow plaintiff only a month to file for the necessary permits with the New York City Department of Buildings ("DOB"). As of March 15, 2018, plaintiff had not filed a proper application and had not sought to show good reason for a further extension of the *Yellowstone* injunction. Accordingly, the injunction has expired.

Plaintiff now seeks as order (1) striking defendant's answer and counterclaims; (2) striking defendant's March 8, 2018 letter to DOB objecting to the application; (3) enjoining defendant from serving any further notices of violation upon plaintiff; and (4) seeking an award of attorney fees. The motion is denied as plaintiff has not shown any sanctionable conduct by defendant, much less conduct so egregious as to call for imposition of the draconian sanctions requested. Further, plaintiff has not shown that the objection defendant filed with DOB on March 8, 2018 caused any material delay in plaintiff's completion of a "proper application" by March 15, 2018."

NYSCEF Doc. 187.

69.    While Tenant filed a Notice of Appeal of the April 27, 2018 order (NYSCEF Doc. 191), the Notice of Appeal was specifically "from the order of the IAS Court denying contempt sanctions, denying suppression of Defendant's answer, and denying fees and

costs." *See* NYSCEF Doc. 191. Further, my attorney informs me that tenant could have, if so inclined, moved pursuant to CPLR 5519(c) for a stay pending appeal. However, given the plethora of case law recognizing that an expiration of a *Yellowstone* resulting in termination of the tenancy prohibits the courts, as a matter of law, from reinstating the tenancy, it appears that Tenant instead filed its bankruptcy petition in a last ditch effort to delay the inevitable.

70.    Landlord thereafter commenced a summary proceeding and caused a Notice of Petition and Petition to be served upon Tenant.

71.    Rather than answer the petition, Tenant instead filed the instant bankruptcy application.

72.    If this Court were to consider, de novo, whether or not Tenant is in a position to "cure," even assuming, arguendo, that the tenancy has not already been terminated (which it has), there are numerous defaults which have not been cured, and cannot be cured by the simple belated filing of an improper Alt-2 application.

73.    The accompanying affidavit of Edwin Tang, the Landlord's expert witness, details many of these defaults which have not been cured (and cannot be cured by the belated filing of an improper Alt-2 application).

74.    In addition, there are substantial monies due and owing from the Tenant, which are set forth in the Proof of Claim (POC) annexed hereto as Exhibit R, detailing the claim calculation as of the bankruptcy filing date (May 3, 2018). Based upon same, as of May 3, 2018, the Landlord's legal fees and costs alone total more than $450,000, and that amount has continued to accrue post-petition. Annexed hereto as Exhibit S is the documentation in support of the POC (i.e., copies of the actual invoices received from Landlord's attorneys and expert witness incurred as a result of Tenant's default).

75.     It is respectfully submitted that this Court should summarily deny any further attempt by Tenant to delay what is clearly and simply the result of Tenant's failure to do that which both the Lease and the law require. As demonstrated above, Justice Sherwood gave Tenant a period in excess of nearly a year and a half to cure. Not only did Tenant fail to cure, but Tenant failed to timely seek appropriate relief to avoid termination of its tenancy.

### **TENANT CONTINUES TO BE UNABLE TO EFFECTUATE A CURE**

76.     Even assuming, arguendo, that the cure period has not expired (which it has), and that there was a legal basis to grant additional time to effectuate a "cure," (which there is not), it is readily apparent that it is impossible for the Tenant to effectuate a cure.

77.     While there are a host of reasons that support the foregoing conclusion, there is probably none more apparent than the issue Tenant confronts with respect to the requisite FDNY waiver it obtained.

78.     At the outset, it bears reiterating that notwithstanding the provisions of the Lease requiring Landlord consent, Tenant submitted drawings and proposed plans to the DOB which were not submitted in advance to the Landlord for their review and consent. Moreover, and as demonstrated before Justice Sherwood, Tenant represented itself in various applications as the Landlord (which clearly it was not). The transparency ordered by Justice Sherwood was ignored by Tenant.

79.     Earlier this week, the Landlord's expert witness (Edwin Tang) went to the Premises along with the Landlord's agent for the purposes of an inspection. Fanny Chang, however, refused to permit Mr. Tang access to the Premises.

80.     In obtaining subpoenaed documents from the NYCDOB, I learned that the copies of the plans that were eventually submitted to me were not the final drawings Tenant

submitted to the DOB. This is a further indication of the extent to which the Tenant has gone to evade its responsibilities.

81.     More importantly, this week I learned from review of drawings submitted by Tenant, that Tenant's reference to this Court on the previous hearing date (whereby Tenant's attorney stated that Tenant "had received the requisite FDNY waiver," was based upon plans and construction on Landlord's space which Tenant has no right to use. Simply put, the FDNY waiver was obtained based Tenant's illegal use of Landlord's property that is not part of the demised premises.

82.     Part of the Tenant's application involved requesting a variance of an existing Tenant-caused non-code compliant rooftop condition related to the Tenant's existing HVAC unit, cooling tower, exhaust fan, etc. In fact, the fire code rooftop access compliant notes set forth in the proposed plans, confirms the foregoing.

83.     Glaringly, the approval stamp from the FDNY and proposed plans show the construction of the additional dunnage on Landlord's roof. In this regard, the Court's attention is directed to the Tenant's Lease (NYSCEF Doc. 2). In relevant part, the Lease provides for the Tenant's rental as follows:

> … The entire demised premises (exclusive of the roof) located at 461 7th Ave., New York, NY (hereinafter referred to as "Premises" or "Demised Premises" in accordance with the terms hereof)
>
> (See NYSCEF Doc. 2, P. 1)
>
> Section 4.00. Tenant shall take good care of the demised premises and shall make all necessary repairs thereto including heating and air-conditioning repairs, and maintenance and repair the demised premises, including the cost of installation of any and all replacement parts. Tenant shall not be responsible for structural repairs of walls, roofs

32

and foundations, except as may be caused by tenant's occupancy. Tenant shall comply with all orders, regulations, rules and requirements of every kind and nature now or hereafter in effect, imposed by the federal, state, municipal or other governmental authorities having power to enact, adopt, impose or require the same, whether they be usual or unusual, ordinary or extraordinary and whether they, or any of them relate to any structural changes or requirements of whatever nature, or to change the requirements incidental to or relating to the use or occupation of the premises; and tenant shall pay all costs and expenses incidental to such compliance hereinafter, and shall indemnify and save harmless the landlord from all expenses and damages by reason of any notices, orders, violations or penalties filed against landlord as owner thereof, because of the failure of tenant to comply with this covenant.

Tenant shall not be permitted to make any structural changes to the demised premises without the express written consent of the landlord.

Section 4.01. Tenant in the use, occupation and control of the Demised Premises… shall comply with all requirements of all laws, orders, ordinances, rules and regulations of the federal, state, county and municipal authorities and with any direction or certificate of occupancy, pursuant to law, of any public officer or officers, which shall impose any duty upon the tenant or landlord with respect to the demised premises for the use, occupation or control thereof for the conduct of any business therein, and shall not make or suffer any waste, or any illegal or offensive use of the demised premises or any part thereof. [Page 12]

Section 5.0. Tenant shall have the right to use the demised premises for grocery, deli, restaurant, sell flowers and any lawful purpose including the use of the sidewalk as stoop stands without landlord's written consent. Tenant covenants and agrees it will not use, or suffer, or permit any person, firm or corporation to use the demised premises, or any buildings or improvements erected thereon, or any portion thereof in violation of the laws of the United States or the State and City of New York, the ordinances or regulations thereof or any other municipality or of any other lawful authority. [Page 13]

33

Section 5.01. Tenant further covenants that during the demised term demised premises and every part thereof, and the buildings and improvements situated thereon or connected therewith and every party thereof and all appurtenances thereto and equipment thereof, shall be kept by tenant at its own cost and expense in good repair and in a clean, wholesome, insurable and tenantable condition and in conformity with the requirements of the United States, State of New York, and of all other governmental authorities; that all health, police, fire and other regulations, including those of the Board of Fire Underwriters… shall in all respects and at all times be fully complied with by the tenant, and that the buildings and improvements at any time situated on the demised premises… shall be made and kept by tenant at its own expense safe, clean and secure and in compliance with all the requirements of all public authorities having jurisdiction thereof. [Page 13-14]

**Article 18.** Writing required for modification, etc.

Section 18.00. This lease cannot be changed orally, but only by an agreement in writing, signed by the party against whom enforcement of the change, modification or discharge is sought or by its duly authorized agent.

Tenant shall not install or fix any signs to the subject premises including the roof without the landlord's express written consent. Notwithstanding anything to the contrary herein contained, the landlord retains exclusive right to rent, sell or lease the real property upon which the demised premises are located including any prospective tenants for the roof with respect to signage/billboard rights. [P. 32-33]

…

All understandings and agreements heretofore made between the parties hereto are merged in this lease, which alone fully and completely expresses the agreement between landlord and tenant and any executory agreement hereafter made shall be ineffective to change, modify, discharge or effect an abandonment of it in whole or in part, unless such executory's agreement is in writing and signed by the party against whom such enforcement of the change, modification, discharge, or abandonment is sought. [P. 40-41]

34

84.    Initially, Tenant attempted to claim before Judge Sherwood that it was the Landlord's March 8 letter that prevented them from complying with the conditions of the Yellowstone. However, documentation provided by the DOB clearly demonstrated that, in fact, contrary to the Tenant's wild allegations against the Landlord, the DOB disapproved the Tenant's Alt-2 application regarding job number 123191465 on March 1, 2018, a full week before the Landlord even sent its letter! Annexed hereto as Exhibit T is a copy of the NYC DOB printout which was submitted to Judge Sherwood as confirmation of the foregoing.

85.    In like fashion, Tenant attempts to mislead this Court by claiming they obtained the FDNY required variance. Tenant's attorney made this allegation, for the first time, at the hearing before Judge Drain on August 2, 2018. While Tenant agreed to provide Landlord documentation in support of this allegation, documentation was not provided until Landlord's attorneys sent multiple emails to Tenant's attorney pointing to the Tenant's noncompliance with the Federal Rules of Civil Procedure requiring disclosure. Review of the very drawings submitted by Tenant, which Tenant attempted to hide from Landlord, readily reveal that the Tenant's obtaining of the variance was based solely upon Tenant's illegal and improper use of the Landlord's rooftop space.

86.    As demonstrated above, the Lease does not grant Tenant permission to utilize the space, and reserves that space for the Landlord's use for signage. As discussed in the accompanying affidavit of Landlord's expert, this newly proposed plan restricts the Landlord's ability to put signage on the roof, and would not only be a violation of Tenant's lease, but it would constitute a trespass.

87.    Since both parties agree that absent an FDNY required variance, Tenant cannot legalize the existing violations, and because it now that it appears that the only way in

which Tenant can obtain the variance is by improperly trespassing and adversely possessing a portion of the Landlord's space (to which the Tenant is not entitled), it is impossible for Tenant to effectuate a cure.

88.     Simply put, Tenant's proposal negatively impacts upon Landlord's use of rooftop in two impermissible ways: (1) it is dependent upon the Tenant's trespass and illegal use use of approximately 20 square feet of additional footprint beyond the space that it is currently utilizing for its HVAC equipment; and (2) it will seriously impinge upon the Landlord's ability to put signage on the rooftop. Tenant has no right, under the Lease, or by law, to utilize that rooftop space or to deprive Landlord of its right to same.

## ADDITIONAL FACTS RENDERING THE TENANT'S ABILITY TO EFFECTUATE A BELATED "CURE" IS IMPOSSIBLE

89.     As the accompanying affidavit of Landlord's expert demonstrates, there are additional serious deficiencies in the Tenant's submission to the DOB. While these are specifically addressed in the Edwin Tang affidavit, they may be summarized as follows:

- Tenant's Alt-2 number 123191465 ostensibly filed to address Landlord's notice to cure fails to provide for the western exit stair an enclosure with a one-hour fire rating that discharges directly to the public right-of-way, as required by New York City Administrative Code Section 27-375(i). While there is a one-hour rated enclosure provided on the second floor landing, the path of travel on the first floor continues to pass through an unprotected area. Furthermore, there is one pendant sprinkler head on the second floor stair landing that is obstructed by the wall (which is contrary to code and cannot be operated as designed). Simply put, the Tenant has failed to address a serious condition that endangers the life, safety, health, and well-being of the building's occupants, as well as threatens the Landlord's property in the event of a fire.

- This same Tenant Alt-2 application fails to address the change of exits performed under a prior application(s) that requires a new certificate of occupancy. Because both the eastern and western exit stairs were relocated under Alt-2 120591305 (filed on February 4, 2011) from a prior location indicated under Alt-2 120575751 (filed January 1, 2011) the relocation of

the exit stair location constitutes a change of egress requiring a new certificate of occupancy. In fact, there were four Alt-2 applications filed from 2005 to 2011 that each proposed relocation of the exit stairs that constituted a change of exits. Tenant has failed to address, let alone take steps adequately "cure" the foregoing.

- This same Tenant Alt-2 application also fails to address another aspect of the Landlord's notice to cure, in that it fails to provide a compliant exit at the western stair location as required under Administrative Code Section 27-365(i), and the required three-hour fire rating for the first floor structure as required by C 26-241 for a "Class III non-fireproof" structures.

- The same Alt-2 application fails to provide an accessible route and circulation for disabled patrons and employees to the cellar and second-floor, fails to provide an accessible entrance on the West 35th St. entrance, and fails to provide accessible bathroom facilities for disabled employees, as required by law.

- The same Alt-2 application fails to address another aspect of Landlord's notice to cure, by failing to provide a one–hour fire rating for the western exit stair at the first floor.

- Similarly, this Alt-2 application fails to provide construction details based on an approved standard for the proposed one–hour fire rated walls enclosing the upper landing of the western stair.

- Incredibly, this Alt-2 application continues to propose accessory use on the second floor that does not allow access by the public and burdens the owner with future upgrades if owner seeks to restore the second floor for retail use that is open to the public. Justice Sherwood in discussing the foregoing, observed that the Landlord should not suffer Tenant's failure to comply, especially where it would trigger compliance requirements under the ADA, which would effectively cause the Landlord to face exorbitant, if not impossible, costs and expenses incurred to restore the premises to its current use.

- Another aspect that this Alt-2 application fails to address is the proposed modification of rooftop exhaust outlets that are located less than 10 feet from property lines, as contrary to MC 506.3.12.3 "Termination Location."

90.    In addition to the foregoing, the inspection of the premises, which Tenant only permitted this week, revealed additional substantial flaws and illegalities as follows:

37

- In the location of the ceiling above the ground/first floor, the construction consists of a single layer of 5/8 inch thick sheet rock attached a steel framing; the underside of the second floor is exposed plywood. Thus, the first floor ceiling and second floor construction is not fire rated;

- Similarly, in the location of the ceiling above the cellar, there is construction the consists of a single layer of 5/8 inch thick sheet rock; and steel and steel beams that are untreated. The cellar ceiling and ground floor construction is not fire rated, despite the fact that the 1938 building code for class III non-fireproof structure requires floors above the cellar to have a three-hour fire rating. The supporting steel beams require a three-hour fire rating.

## TENANT REMAINS IN DEFAULT OF ITS INSURANCE OBLIGATIONS

91.    One of the main issues involving Tenant's default was its failure to maintain the requisite insurance, as required by the parties' lease. While some effort was made on the part of the Tenant to address the foregoing, Justice Sherwood put insurance issue on the back burner, because he felt that it presented "triable issues of fact."

92.    However, subsequent to the expiration of the Yellowstone, and after the Tenant's time to cure expired, Landlord served a termination notice with an updated insurance "matrix" specifically detailing the instances in which Tenant has defaulted on its insurance obligations. A copy of the notice of termination with insurance matrix appears that NYSCEF Doc. 141, a copy of the notice of termination with the Exhibits A and B, setting forth the insurance requirements per lease relating to liability coverage (Exhibit A) and property coverage (Exhibit B) See Exhibit Q.

93.    Tenant has never addressed, let alone adequately demonstrated, any effort or ability to cure these insurance defaults. Moreover, as demonstrated in the accompanying supplemental affirmation of Landlord's attorneys, these insurance defaults are, as a matter of law, incurable.

## **CONCLUSIONS**

94.     There are several takeaways from the foregoing. Not the least of which is the fact that the record before Judge Sherwood readily reveals Tenant's failure to comply with the conditions of the Yellowstone. Despite the passage of over a year and a half to "cure," and Judge Sherwood's permitting substantially more time than any commercial tenant gets in this type of case, Tenant nevertheless failed to cure. It bears reiterating, that Judge Sherwood found that the Tenant had an obligation to come to the Court and ask for more time, yet failed to do so, for no reason, whatsoever.

95.     Tenant has engaged in gamesmanship in an effort to mislead this Court, as it did Justice Sherwood, into believing that it is "ready, willing, and able, to effectuate a cure." In fact, as the accompanying affidavit of Landlord's expert readily reveals, the Tenant has not only failed to cure, but the present applications submitted do not make a cure feasible. Indeed, it appears, if anything, Tenant's ability to cure is virtually impossible, because in order to obtain the requisite NYC FDNY variance, it would require Tenant to trespass and adversely possess a portion of the Landlord's space to which tenant is not entitled. Accordingly, the Court should grant the Landlord's motion and vacate the stay, to permit Landlord to pursue its remedy in the summary holdover proceeding in which the Tenant has failed to answer.

WHEREFORE, it is respectfully requested that the motion by Delshah to vacate the

stay be granted in its entirety, together with such other and further relief as this Court may deem

just and proper.

_____
MICHAEL SHAH

Sworn to before me this
29 day of August 2018

_____
NOTARY PUBLIC

SAMANTHA BRAGA
NOTARY PUBLIC-STATE OF NEW YORK
No. 01BR6342479
Qualified in Kings County
My Commission Expires 05-23-2020

RE\23448\0019\2500309v5