UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

In re                                                    Chapter 11

      461 7th Avenue Market, Inc.,                     Case no.  18-22671

                    Debtor.

-------------------------------------------------------------x

## SECOND SUPPLEMENTAL OBJECTION TO MOTION TO ASSUME LEASE

Delshah 461 Seventh Avenue, LLC ("Landlord"), as and for its (a) supplemental

objection to the motion made by 461 7th Avenue Market, Inc. ("Debtor"), to assume its lease

with the Landlord, (b) supplemental support for the Landlord's lift stay motion, and (c)

supplemental disclosure statement objection, respectfully represents as follows:

    1.      Events subsequent to the September 5, 2018 evidentiary hearing have resulted in

new evidence which underscores each of the following:

      (i)     the lack of merit to Debtor's claims;

      (ii)    the misrepresentations made in the September 5, 2018 evidentiary hearing; and

      (iii)   that the Debtor is unable to cure its lease defaults.

    2.      After the commencement of the hearing on September 5, 2018, the following

events took place:

      (i)     On November 1, 2018, the Department of Buildings ("DOB") issued a Notice of Objection for Debtor's Alt-2 application numbered 123445361[1];

      (ii)    On November 2, 2018, the DOB issued a Notice of Objection for Debtor's Alt-2 application numbered 123191465[2]; and

---

[1] Herinafter, "DOB NOO 1"
[2] Herinafter "DOB NOO 2"

      (iii)    On October 24, 2018 the New York City Fire Department ("FDNY") issued a Summons against the Landlord for the Debtor's roof equipment[3].

3.      While any one of the aforementioned events provides a sufficient basis to conclude that the Debtor's motion to assume the parties' lease lacks merit (particularly the DOB NOO 2 and the FDNY Summons), when looked at together, the events subsequent to the September 5, 2018 hearing should lead this Court to deny the Debtor's motion in its entirety.

4.      Landlord addresses each of the foregoing below.

**I.**      **NOTICE OF OBJECTION FOR ALT-2 123191465 DATED NOVEMBER 2, 2018**

5.      On November 2, 2018, the DOB issued the DOB NOO 2 for Debtor's pending Alt-2 application numbered 123191465. A certified copy of the DOB NOO 2 is attached hereto as Exhibit A.

6.      While, two or three of the stated objections in the DOB NOO 2 are seemingly *de minimis* (i.e. the requirement of Landlord's signature or the clarification of whether the first and second floor are single or multi-tenant occupancies), the majority of the objections are significant because they reveal the practical impossibility of the work that must be performed as a precondition to obtaining the requisite DOB approval, including:

      a)    Providing accessibility to the second floor restroom;

      b)    FDNY access to the roof requires access from the frontage space, each other fire apparatus accessible exposure, and a clear path from the front of the building to the rear and from one side of the building to the other;

      c)    Providing two means of enclosed egress from the cellar and the second floor;

---

[3] Heinafter "FDNY Summons"

    d) Providing handicap accessibility for the second
       floor bathroom.

    e) Providing handicapped facilities for restroom
       with specified dimension; and

7.    The list of aforementioned objections from the DOB directly undermines Debtor's representations at the September 5, 2018 evidentiary hearing, namely, that because Alt-2 123191465 had passed the plan examination stage, the only impediment to Debtor moving forward with the Alt-2 applications was Landlord's refusal to sign off of the applications. It is now incontrovertible that numerous deficiencies exist in Alt-2 123191465, illustrating that Debtor has been in default for years, as outlined in Landlord's Notice to Cure, dated January 19, 2017 (the "Notice to Cure"). At best, the Debtor has failed to grasp the laws and codes with which it must comply; at worst, the Debtor has materially misrepresented its ability to cure the lease violations. It is virtually impossible to cure the lease violations, given the newly issued DOB objections, especially with the Debtor's cash on hand (Docket No. 80) and the Debtor's plan obligations (Docket No. 76).

8.    These independent and objective determinations by the DOB confirm what the Landlord has been stating for years and may not be overlooked. The Tenant's applications, when taken together, do not comply with the applicable law and building codes.

a. **"Provide Accessibility to 2nd floor Restrooms"**

9.    One of the major objections in the DOB NOO 2 is the Debtor's failure to provide handicapped accessibility to the second floor bathroom at 461 7th Ave., New York, New York (the "Premises"). *See* Exhibit A ¶ 3.

10.    Before the September 5, 2018 evidentiary hearing, Landlord's expert, Edwin Tang, submitted an affidavit addressing many of the issues raised in the Notices of Objection, including

the requirement of accessibility to the only bathroom in the Premises, located on the second floor. *See* Tang Affidavit, sworn to on August 29, 2018.

11.    Submitted with the Tang Affidavit was Mr. Tang's expert witness report (the "Tang Expert Report") (attached to the Tang Affidavit as Exhibit B), which was updated as of August 27, 2018. The expert witness report is based on Mr. Tang's review of the Debtor's Alt-2 plans, as well as several site visits to the premises. Specifically, Mr. Tang's report states the following relevant observations regarding accessibility to the second floor bathroom:

> 8.  **Required Accessibility Upgrades Circumvented after 50% Cost Threshold was Exceeded** …
>
> d. Accessible bathrooms per BC 1109.2. The bathrooms are located on the second floor and are currently non-accessible to persons with disabilities entering the premises from the first floor. BC 1109.2 specifically states that the only bathrooms in a facility may not be located on a floor that is not accessible.
>
> **8/27/18**: Tenant Alt 2 #123191465 filed to address Notice to Cure from Michael Shah dated 1/19/2017 fails to provide an accessible route and circulation for disabled patrons and employees to the cellar and second floor, fails to provide an accessible entrance on W 35th Street, and fails to provide accessible bathroom facilities for disabled employees.

See Exhibit B to the Tang Affidavit; ¶ A(8).

12.    Based upon the objections in the DOB NOO 2, the concern over accessibility to the second floor bathroom is not just an exercise by the Landlord to force the Debtor to undertake unnecessary work at the Premises; accessibility is a mandatory requirement necessary to put the Premises in compliance with the Americans with Disabilities Act ("ADA") and Local Laws 58 and 87. *See* Exhibit A ¶ 3.

- 4 -

13.     At the September 5, 2018 evidentiary hearing, in answering why he believed the

Debtor was still in violation of the parties' lease regarding egress (discussed below) and

accessibility, Landlord's principal, Michael Shah, stated as follows:

> Our comments have basically consisted, for the past
> eighteen months, of two means of egress from the
> cellar if you're going to occupy it, an elevator for
> accessibility, or a handicap bathroom on the first
> floor because I, as landlord, have gotten sued under
> the New York Civil Rights Code, New York States
> Civil Rights Code, and the ADA by plaintiff's
> attorneys that walk around and sue owners under
> basically plaintiff's contingency fees for violations
> of those statutes. And I retain that liability. And you
> have chosen not to address those comments. And
> ultimately, the Alt2 that was filed at the DOB was
> not the Alt1 that we commented on, it was not the
> Alt2 that we approved; it was an entirely different set
> of plans.

*See* the transcript dated September 5, 2018 attached hereto has Exhibit B; pg. 123, lns. 3-15.

14.     This objection legitimizes Landlord's concerns over the lack of accessibility to the

second floor. To bring the Premises into compliance with the accessibility requirements for access

to the second floor bathroom, the Debtor must install an elevator in the Premises, which the Debtor

has routinely stated it is not willing to do. Regardless of whether the Debtor is willing to install

the elevator to achieve accessibility to the second floor, the cost of installation of the elevator

greatly exceeds the amount the Debtor has to effectuate a cure (Docket No. 76), rendering the cure

of the Lease defaults impossible and this Plan patently unconfirmable.

**b.   "Also Fire Dept. access to Roof requires access to the roof from the frontage space
and each other fire apparatus accessible exposure, and a clear path from the front of
the building to the rear and from one side of building to the other"**

15.     A second major life safety concern at the Premises highlighted in the DOB NOO 2

is the configuration of the Debtor's equipment on the roof of the building. *See* Exhibit A ¶ 4.

- 5 -

16.     As discussed in detail under Heading II below, the terms of the Lease specifically exclude the roof from the premises demised to the Debtor[4].

17.     This issue has also been raised numerous times by the Landlord and its expert, Edward Tang. In the Tang Affidavit, Mr. Tang stated as follows:

> 18. Tenant's proposal negatively impacts upon Landlord's use of rooftop in two impermissible way: (1) it is dependent upon the tenant' use of approximately 20 square feet of additional footprint beyond the space that is currently utilizing for its HVAC equipment; and (2) it will seriously impinge upon the Landlord's ability to put signage on the rooftop. Tenant has no right, under the Lease or by law, to utilize that rooftop space or to deprive Landlord of its right to same.
>
> 19. Per the most recent tenant drawings under Alt-2 #123191465 approved by the NYC DOB on April 9, 2018, new crossover stairs are proposed on the roof that occupies an additional 20 sf of rooftop area. This further diminishes the available space on the roof for other uses such as signage.

See Tang Affidavit ¶¶ 18-19.

18.     The Debtor is not permitted to occupy the space in any capacity, let alone take more space to comply with the Fire Code. Moreover, even after taking the additional space (which Debtor has no right to use) as shown by Alt-2 123191465, the DOB still issued an objection related to the fire access as shown in the accompanying plans. See Exhibit A at ¶ 4[5].

---

[4] The original lease for the Premises was executed on or about July, 2003, between Mary Jane Medicus O'Brien and John Delmour Medicus, as landlord, and 461, Inc., as tenant (the "Lease").

[5] The DOB NOO 2 also provides that Debtor needs to "obtain Owner's Approval for the Renovation of the Roof Work." See Exhibit A ¶ 2. Because the rooftop is not part of the Debtor's leased Premises, Landlord is under no obligation to sign off on the Debtor's proposed rooftop renovation. Absent the Landlord's sign off, the rooftop work cannot be completed making Debtor's cure of the violations related to the rooftop an impossibility.

19.     Simply put, the Debtor has no ability to cure this objection because doing so necessitates taking additional space on the roof that the Debtor is not entitled to.

c.     **"Provide Two means of egress (enclosed) from Cellar and 2nd Floors"**

20.     An additional objection raised by the DOB is the egress from the cellar and the second floor of the Premises, which has been a major deficiency raised by the Landlord in reviewing the Debtor's plans. *See* Exhibit A ¶ 5.

21.     In the Tang Expert Report, Mr. Tang makes the following observations regarding egress:

> 1.  **Unsafe Egress Condition created from the Second Floor**. …
>
> **8/27/18:** tenant Alt 2 # 123191465 filed to address Notice to Cure from Michael Shah dated 1/19/2017 fails to provide for the western exit stair an enclosure with a 1-Hour Fire Rating that discharges directly to the public right of way as required by 27-375(i). A 1-Hr rated enclosure is provided on the second-floor landing by the path of travel on the first floor continues to pass through an unprotected area …
>
> 2.  **Unsafe Egress Condition created from the Cellar**

*See* Exhibit B to the Tang Affidavit; ¶¶ A(1) & A(2).

22.     Rather than submit an alteration application that addresses the concerns with egress from the cellar and the second floor, the Debtor has argued that it is exempt from the requirement and represented to this Court at the September 5, 2018 hearing that the scope of work contained in the Alt-2 applications was appropriate.

23.     For example, when questioned about Mr. Tang's concern over the proposed egress on the second floor, Debtor's expert, Bryan Winter, stated as follows:

> While it doesn't meet the specifics of the code, the
> open stairs with sprinklers are a common design
> feature in thousands of facilities in New York City.
> And especially with the low occupancy, though, in
> the upper floors, it would be completely acceptable.
> The department – it may be subject to department
> review; the department has given this many times.

*See* Exhibit B; pg. 33, lns. 17-22.

24.     Despite Mr. Winter's assertions that the open stair proposal was a common design

feature and should be accepted by the DOB, it is clear from the DOB NOO 2 that the DOB agreed

with the analysis of Landlord's expert, Mr. Tang, insisting that the Debtor must provide two means

of enclosed egress from the second floor and the cellar. *See* Exhibit B at ¶ 5.

25.     Furthermore, at the September 5, 2018 evidentiary hearing, Mr. Winter stated that

the scope of work in the Debtor's Alt-2 plans was proper because it had been reviewed by the

DOB. With respect the Debtor's Alt-2 applications containing exemptions that did not meet the

letter of the code, Mr. Winter testified as follows:

> Q. And do you know within the 1465 application [if]
> all of the exemptions that you're saying
> hypothetically could be granted were called out and
> explained in that fashion?
>
> A. All of them that are hypothetically granted, the
> department doesn't require. They don't generally, as
> a matter of principle, require every nuance and
> variance of the code to be done by either Alt1 or
> determination.
>
> Q. Are any of them submitted in the 1465 application
> called out in the fashion that the New York City
> Administrative Code says –
>
> A. I do not know. I would remind you that they were
> audited and reviewed by the department and
> accepted, and therefore, in many ways, that is by
> definition the approval of the variations as necessary.

*See* Exhibit B; pgs. 36-37, lns. 25-13.

- 8 -

26.    In summary, the deviations from the code may have seemed acceptable to the DOB

by virtue of the fact that Alt-2 123191465 went through the plan review process received a permit.

But upon closer inspection through special audit, the DOB found numerous issues with the

Debtor's Alt-2 applications and expressed same in the Notices of Objection.

**d.    "Also need to provide Handicapped Accesi[bility] for the second floor bathroom" & "Provide H/C facilitated for Rest Room must be specified with required dimensions"**

27.    The DOB raised similar objections relating to the lack of accessibility of the second

floor bathroom in the Premises. *See* Exhibit A ¶¶ 3 & 7.

28.    If the Debtor does not want to make the second floor bathroom handicap accessible

and provide access to the second floor, the Debtor can achieve accessibility by installing a

handicap, ADA accessible bathroom on the first floor.. However, in what has become a theme

throughout this litigation, rather than face the issue head-on, the Debtor has focused its efforts in

trying to skirt compliance with law.

29.    At the September 5, 2018 evidentiary hearing, this Court inquired about the

accessible bathroom and the following colloquy ensued:

> THE COURT: On the other point, on the bathroom,
> is there – is there some fundamental impediment to
> putting the bathroom in?
>
> MR. KIMM: The store's already small, 1500 square
> feet.
>
> THE COURT: Right.
>
> MR. KIMM: It's exempt from the ADA bathroom
> requirement. The ADA bathroom requirement,
> Judge, is vigorously enforced by the mayor's office
> in New York City. And it is not enforced with a
> 1500-square-foot-spaced store, which already has no
> space.

*See* Exhibit B; pgs. 148-149, lns. 17-1.

- 9 -

30.     The DOB has spoken. Based on the foregoing objections in DOB NOO 2, the Premises are subject to the accessibility requirements of the ADA.

31.     Not only is the Debtor in default of the Lease with respect to this objection, but by refusing to install an accessible bathroom, the Debtor is subjecting the Landlord to liability from claims related to accessibility for the discrimination against the Debtor's employees and patrons with a disability.

e.     **"104074822, 120002852, 120575751 & 1205591305 have the same scope of work and similar interior construction work. No need to Audits those 4 applications."**

32.     In performing the special audit that caused the DOB NOO 2, the DOB stated that no individual audits were necessary for Alt-2 applications numbered 104074822, 120002852, 120575751 & 1205591305 because those application "have the same scope of work and similar interior construction" to Debtor's pending Alt-2 application numbered 123191465. *See* Exhibit A ¶ 9.

33.     The only logical extension from the foregoing is that had the prior alteration applications at the Premises been audited the way Debtor's pending Alt-2 applications were audited, they too would have failed for similar reasons.

34.     Throughout this litigation, Landlord has voiced concerns over the propriety of the previously filed Alt-2 applications. At the September 5, 2018 hearing, Landlord and Debtor's counsel had the following exchange related to the prior applications:

> Q. Now, you're still arguing that the tenant is in violation of the DOB code and you're still arguing that the tenant is in violation of the lease, correct?
>
> A. I am arguing that the tenant's in violation of the lease, yes.
>
> Q. As of today, you're still arguing?
>
> A. As of today.

Q. Right. And that's despite the fact that the DOB has approved it but for the fact that you refuse to sign off, correct?

A. That is not correct. The DOB has approved an alteration type 2. The tenant can submit a square changing a door in the room and the DOB will approve it because there's nothing in that change that is improper. It does not mean that the DOB has reviewed. And, in fact, the 2011 – and I don't think the Court properly understood this between the two experts that testified earlier.

The 2011 applications in question that generated the violations in the notice of cure are under audit at the DOB right now. And because they're old applications, the DOB has yet to generate their audit responses to those. So what we've been dealing with is a consultant on my part who reviewed those applications, cited violations, limited ones. You had an architect that reviewed those, admitted certain violations, and then ultimately, you guys have chosen to propose a method of cure that does not address even what your own architect said needed to be done. But Mr. Winter has found another way to address certain things, but that doesn't address the violations that we thought were at issue in the original applications …

*See* Exhibit B; pgs. 123-124, lns. 16 – 19.

35.    Because of the objections in the DOB NOO 2, and given the accuracy of Mr. Tang's analysis of the Alt-2 applications submitted for the Premises, it is now clear that the previously submitted Alt-2 applications would have been denied had they been audited.

**II.    FDNY SUMMONS DATED OCTOBER 24, 2018**

36.    On October 24, 2018, the New York City Fire Department issued a violation against the Landlord (Summons # 011662311R) related to the roof space being occupied by the Debtor, in contravention of the Lease. A copy of the FDNY Summons is attached hereto as Exhibit C.

- 11 -

37.    The violation is described as VC9 Rooftop Access and Means of Egress for failure to provide access/egress free from obstructions or impediments, and/or failed to maintain required egress at Rooftop.[6] *See* Exhibit C.

---

[6] The current configuration of Debtor's equipment on the roof is noncompliant with the following sections of the Fire Code:

FC 504.4.6 – **Required Rooftop Clearances**
A minimum clearance of 6 feet (1829 mm) in all directions shall be provided from each door opening onto a rooftop from a dwelling unit, stairway, bulkhead, or other occupied space or means of egress, as measured from the door hinge. A minimum clearance of 3 feet (914 mm) in all directions shall be provided from any fire escape or rooftop access ladder, as measured from each side of the ladder or landing.

FC 504.4.1 - **Rooftop Access**
Access to building rooftops shall be provided for fire operations by providing unobstructed access to the rooftop, including unobstructed passage across the building parapet, perimeter fence or other obstructions, and a safe landing. Such rooftop access shall be provided in compliance with the following required clearances:

1.   For each 12 linear feet (3658 mm) of building perimeter accessible from the frontage space of the building and from any other exposure accessible to fire apparatus, a minimum clearance of 6 feet (1829 mm) in width and 6 feet (1829 mm) in depth from any obstruction shall be provided at the parapet wall or other perimeter of the rooftop.
2.   Where such building perimeter is 24 linear feet (7315 mm) or greater, but less than 36 linear feet (10 973 mm), the required clearance openings shall be separated by a distance of not less than 12 linear feet (3658 mm).
3.   Where such building perimeter is 36 linear feet (10 973 mm) or greater, the required clearance openings may be contiguous, provided, however, that such contiguous openings shall not exceed 12 linear feet (3658 mm) and shall be separated from other required clearance openings by a distance of not less than 12 linear feet (3658 mm).
4.   Each exposure accessible by fire apparatus may be treated separately for purposes of locating clearance openings and otherwise complying with the requirements of this provision.
5.   Awnings, sun control devices, solar panels or other structures affixed to an exterior building wall below the roof line shall not obstruct fire apparatus aerial ladder access to the rooftop perimeter access locations.
6.   Scaffolding obstructing rooftop access locations shall be designed to provide secure landings at such locations in an approved manner.

- 12 -

38.     The Supplemental Information Form, attached to the FDNY Summons, provides as

follows:

> Failure to comply with conditions of FD approval of
> a rooftop installation.
>
> Remedy: Proposed non-combustible crossover shall
> be installed as noted on rooftop plans dated March
> 22, 2018, FPIMS #38096806.
>
> Carrier N/A

*See* Exhibit C.

39.     On or about November 28, 2018, Landlord received a notice related to FDNY

Summons, which provides, in relevant part, as follows:

> Please take notice that the premises cited above is in
> violation of the requirements of law. It is ordered by
> the Fire Commissioner that these violations be
> corrected and certified to be in compliance with the
> requirements of law within 35 days of the violation
> date.

A copy of the Notice received on November 28, 2018 is attached hereto as Exhibit D.

40.     As discussed briefly above (and in detail in the Shah Affidavit sworn to on August

29, 2018), the Debtor has no right to occupy the roof space, in any capacity. The Lease provides,

in relevant part:

> … The entire demised premises (***exclusive of the
> roof***) located at 461 7th Ave., New York, NY
> (hereinafter referred to as "Premises" or "Demised
> Premises" in accordance with the terms hereof)

*See* NYSCEF Doc. 2, P. 1 (emphasis added)

41.     The rooftop plans referenced in the Supplemental Information Form (*see* Exhibit

C), contemplate the illegal and improper use of additional space on the roof. Now, Landlord is

being subject to penalties because the rooftop plans that Debtor submitted (which take space the

Debtor is specifically excluded from) have not been effectuated, and because the existing condition

of the roof (which the debtor created through its own self certified application, Alt 2 120591305),

is illegal.

42.     This is precisely the type of liability Landlord's principal, Mr. Shah, was

contemplating while being cross examined at the September 5, 2018 hearing when he stated that

he is responsible for conditions in the building that existed before his acquisition. Specifically, Mr.

Shah explained as follows:

> Q. Isn't it true that, before December 2016, you
> served no notice of any breach of the lease based on
> any condition of the premises to the tenant?
>
> A. That's probably correct.
>
> Q. In fact, you served a thirty-day notice to cure in
> December 2016, correct, sir?
>
> A. It sounds right.
>
> Q. And that contained a litany of issues that your
> professionals, not you, had discovered, correct?
>
> A. Yes.
>
> Q. And much of those issues predated your
> ownership in May of 2015, correct sir?
>
> A. They predate my acquisition, but I'm still liable
> as a building owner as to the condition of the
> building.

*See* Exhibit B; pg. 119, lns. 5-18.

43.     The debtor could easily cure this condition, and comply with the lease by removing

all of its equipment from the roof.  Instead, the Debtor has attempted to take advantage of the

Landlord by seeking a waiver from the FDNY, under the misrepresentation that the equipment on

the roof was a pre-existing condition. This is untrue. The Debtor placed the equipment on the roof,

thus creating the condition.  It is FDNY policy not to grant waivers for hardships that are self-

created. Put simply, in order to cure the lease default, the debtor must remove its HVAC equipment

from the roof, as Debtor is not entitled to occupy that space. Debtor is free to install an alternative

means of heating and cooling without trespassing on the Landlord's property and causing

hazardous conditions in violation of fire code on such roof.

44.     Since both parties agree that absent an FDNY required variance, the Debtor cannot

legalize the existing violations, and because it now clear that the only way the Debtor can obtain

the variance is by improperly trespassing and adversely possessing a portion of the Landlord's

space (to which the Tenant is not entitled), it is ***impossible*** for Tenant to effectuate a cure without

removing its equipment.

45.     Any additional taking of space on the roof impedes the Landlord's ability to erect

roof signage as contemplated by the Lease. Section 18 of Article 18 of the Lease provides, in

relevant part, as follows:

> Tenant shall not install or fix any signs to the subject
> premises including the roof without landlord's
> express written consent. Notwithstanding anything
> to the contrary herein contained, the landlord retains
> exclusive right to rent, sell or lease the real property
> upon which the demised premises are located
> including any prospective tenants for the roof with
> respect to signage/billboard rights.

*See* NYSCEF Doc 2, Pg. 32-33.

46.     As demonstrated above and in the Tang Affidavit at ¶¶ 18-19, the proposed rooftop

plans in Alt-2 123191465 take roughly 20 square feet of additional rooftop space, further infringing

on the space explicitly reserved for the Landlord, and which the Landlord has expressed it intends

to use to erect signage.

- 15 -

### III.   NOTICE OF OBJECTION FOR ALT-2 123445361 DATED NOVEMBER 1, 2018

47.   On November 1, 2018 the DOB issued DOB NOO for Alt-2 123445361 after completing a special audit of same.

48.   The stated reason the DOB objected to Alt-2 123445361 was:

> 1.   The Tenant signed [the] PW-1 as the Owner of the Corporation. Need to obtain Owner's signature on PW-1 form.[7]

A certified copy of the November 1, 2018 Notice of Objection-Special Audit is attached hereto as Exhibit E.

49.   Regarding the objections in the DOB NOO related to Landlord's signatures, the Debtor failed to provide the Landlord with either of the pending Alt-2 applications before filing same with the DOB. The Landlord had no ability to determine whether the work submitted in the Alt-2 applications was permitted by the terms Lease.

50.   Section 4.00 of Article 4 of the Lease provides, in relevant part, as follows:

> Tenant shall not be permitted to make any structural changes to the demised premises without the express written consent of the Landlord.

See NYSCEF Doc. 2, pg. 12.

51.   Since the Landlord could not review the plans before submission, the Landlord could not know whether structural alterations were submitted to the DOB that would otherwise require landlord's consent. The lack of review caused the Landlord to inform the DOB that it had not consented to the Debtor's Alt-2 applications, as summarized by the following colloquy between Debtor's counsel and Mr. Shah:

---

[7] The DOB NOO 2 lists the same objection. See Exhibit A ¶ 1.

- 16 -

> Q. On March 8, you wrote a letter outlining a number
> of objections to the DOB, correct?
>
> No, not to that alteration application. I wrote a letter
> to the DOB after Brad Silverbush contacted you and
> tried to get a copy of the ALT2 plans that you were
> filing and you didn't give them to him. Then I wrote
> a letter to the DOB saying I have not seen these plans,
> I do not approve of them.

52.    Even if the proposed work is not structural, the Landlord has an interest in ensuring that the work performed will be code compliant. For example, when the Landlord finally could view Alt-2 123445361, Landlord's expert, Edwin Tang, pointed out that the Debtor had placed a pendant sprinkler head behind a wall, creating a fire hazard in contravention of NFPA 13. *See* Exhibit C to the Tang Affidavit. The Debtor's propensity to cut corners, as demonstrated by its numerous deficient filings, would lead any reasonable landlord to request alterations plans before they were filed with the DOB.

53.    Finally, while it may be a small point in light of the numerous objections to the Debtor's plans raised by the DOB in the DOB NOO 2, it was the Debtor that brought upon the Landlord's refusal to approve the plans by Debtor's failure to provide same before submission.

## IV. NO ACTION HAS BEEN TAKEN SINCE THE SEPTEMBER 5, 2018 HEARING

54.    In the time since the September 5, 2018 evidentiary hearing, there have been two settlement conferences, including a substantive conference on September 22, 2018 where the parties walked through the Tang Expert Report.

55.    In the wake of the settlement conferences, the Debtor agreed to cure, or propose a cure, to numerous items listed in the Tang Expert Report.

56.    Landlord subsequently followed up with the Debtor regarding the Debtor's stated desire to cure six of the major open Lease defaults at the Premises, and each time the Landlord speaks with the Debtor, the Debtor claims that cures and responses to open items are forthcoming.

- 17 -

57.    However, to date, the Debtor has done <u>nothing</u> to cure the agreed upon issues at the Premises.

**V.  <u>SUPPLEMENTAL DISCLOSURE STATEMENT OBJECTION</u>**

58.    In its initial disclosure statement objection, the Landlord argued that (a) the Debtor's plan is based on the fallacy that the Debtor has the resources to cure its defaults under the Lease, but after its Yellowstone injunction expired the Debtor lost the right to cure those defaults, and (b) since the Debtor's plan is unlikely to be confirmed, disclosure statement approval should be denied, or consideration at least deferred until a final determination on whether the Lease terminated pre-petition.

59.    The Bankruptcy Court moved forward with an evidentiary hearing on whether the Debtor could cure the Lease defaults *assuming* that the Lease did not terminate pre-petition.  As established herein, the Debtor's proposed cure, assuming the Lease did not terminate, violates numerous codes applicable to the Premises.

60.    Since the Plan is predicated on Lease assumption, and since the Debtor has proffered no means to cure Lease defaults legally, the Disclosure Statement describes a Plan that cannot be confirmed, even if the Lease did not terminate pre-petition.

**<u>CONCLUSION</u>**

WHEREFORE, the Landlord respectfully requests that the Court deny the Debtor's Lease assumption motion pending a State Court decision on whether the Lease

terminated pre-petition, lift the automatic stay to permit the Landlord to prosecute its Civil Court

holdover action, and that the Court grant such other relief as may be just and proper.

Dated:        New York, New York
              November 27, 2018

                                        **ROSENBERG & ESTIS, LLP**
                                        Attorneys for the Landlord

                                        By:      s/ Richard B. Corde_____
                                                 733 Third Avenue
                                                 New York, New York 10017
                                                 (212) 867-6000

**BACKENROTH FRANKEL & KRINSKY, LLP**
800 Third Avenue
New York, New York 10017
(212) 593-1100